**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

STATEWIDE ORGANIZING FOR COMMUNITY EMPOWERMENT
P.O. Box 12667
Knoxville, TN 37912,

HOOSIER ENVIRONMENTAL COUNCIL
3951 North Meridian, Ste. 100
Indianapolis, IN 46208,

INDIANA STATE CONFERENCE AND LAPORTE COUNTY BRANCH OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
P.O. Box 64798
Gary, IN 46401,

SIERRA CLUB
2101 Webster St., Ste. 1300
Oakland, CA 94612,

CLEAN POWER LAKE COUNTY
347 Douglas Ave.
Waukegan, Illinois 60085,

ENVIRONMENTAL INTEGRITY PROJECT
1 Thomas Cir., Ste. 900
Washington, D.C. 20005,

Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and MICHAEL S. REGAN, in his official capacity as Administrator, United States Environmental Protection Agency,
Office of the Administrator (1101A)
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460,

Defendants.

Civ. No. ________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. With this action, Plaintiffs Statewide Organizing for Community eMpowerment, Hoosier Environmental Council, Indiana State Conference and LaPorte County Branch of the National Association for Advancement of Colored People, Sierra Club, Clean Power Lake County, and Environmental Integrity Project (hereinafter "Plaintiffs") seek to compel Defendants United States Environmental Protection Agency ("EPA" or "the Agency") and Michael S. Regan, the Administrator of the United States Environmental Protection Agency (collectively, "Defendants") to fulfill their duty under section 2002(b) of the Resource Conservation and Recovery Act ("RCRA" or "the Act"), 42 U.S.C. § 6912(b), to review and revise regulations that are inadequate to protect human health and the environment from the widespread and serious risks caused by the unsafe disposal of coal combustion residuals ("CCR" or "coal ash").

2. Coal-fired power plants generate one of the largest toxic solid waste streams in the United States. In this voluminous waste stream are large quantities of heavy metals and metal compounds such as arsenic, boron, cadmium, chromium, cobalt, lead, lithium, mercury, molybdenum, radium, selenium, and thallium. These toxic chemicals can cause cancer and other adverse health impacts including reproductive, neurological, respiratory, and developmental problems.

3. On April 17, 2015, EPA promulgated the Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals From Electric Utilities, Final Rule ("CCR Rule"). 80 Fed. Reg. 21,302 (Apr. 17, 2015). The CCR Rule amended Subpart D of 40 C.F.R. to include "Standards for the Disposal of Coal Combustion Residuals in Landfills and Surface Impoundments," 40 C.F.R. §§ 257.50–257.107. The CCR Rule applies to a limited


universe of CCR surface impoundments and landfills, but EPA exempted from regulation all CCR landfills that ceased accepting coal ash prior to October 19, 2015 (hereinafter referred to as "inactive CCR landfills"). 40 C.F.R. § 257.50(d).

4. EPA's blanket exemption of inactive CCR landfills allows hundreds of dangerous and leaking toxic dumps to escape critical safeguards, including monitoring, inspection, closure, cleanup, and reporting requirements. Data reveal that the toxic heavy metals leaking from inactive CCR landfills located throughout the U.S. pose an unabated and significant threat to human health and the environment.

5. RCRA commands Defendants to review and, where necessary, revise each regulation promulgated under the statute not less frequently than every three years. 42 U.S.C. § 6912(b).

6. Since the CCR Rule was promulgated in 2015, Defendants' most recent review of the regulation exempting inactive CCR landfills was due in 2018. However, Defendants have not once reviewed the regulation exempting inactive CCR landfills.

7. As of the date of this filing, Defendants' review of the regulation exempting inactive CCR landfills is more than four years overdue.

8. Accordingly, Plaintiffs seek: (1) a determination that Defendants' failure to review and, if necessary, revise the regulation exempting inactive CCR landfills, 40 C.F.R. § 257.50(d), violates RCRA, 42 U.S.C. § 6912(b); and (2) an order compelling Defendants to take this required action in accordance with an expeditious deadline set by this Court.

## JURISDICTION

9. This action arises under the citizen suit provision of RCRA, *Id.* § 6972(a)(2).

10. This Court has jurisdiction over this action pursuant to *Id*. § 6972(a), as well as 28 U.S.C. §§ 1331, 1361, and may issue a declaratory judgment and grant further relief pursuant to 42 U.S.C. § 6972(a) and 28 U.S.C. §§ 2201–2202.

11. Plaintiffs have a right to bring this action pursuant to 42 U.S.C. § 6972(a)(2) and the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

12. By certified letter posted May 17, 2022, Plaintiffs gave notice to Defendants of this action and have thereby complied with the sixty-day notice requirement of RCRA's citizen suit provision. *See* 42 U.S.C. § 6972(c).

**PARTIES**

13. Plaintiff Statewide Organizing for Community eMpowerment ("SOCM"), founded in 1972 in the coal fields of East Tennessee, is a democratically run, membership-based organization that uses civic involvement, leadership development, and collective action to empower everyday Tennesseans to have a greater voice in determining their own future. With over 1,700 members statewide, SOCM has led many local and regional efforts to challenge harmful coal mining permits, advocate for proper mine site reclamation, and support federal just transition legislation through local-based advocacy campaigns and meetings with legislators.

14. Plaintiff Hoosier Environmental Council ("HEC") is Indiana's largest environmental policy nonprofit organization, with more than 1,400 members statewide. HEC's mission is to tackle environmental challenges and help make Indiana a healthier, better place to live and do business. Since its founding in 1983, HEC has become Indiana's leading educator and advocate on environmental issues and policies, and toxic coal ash cleanup in the state.

15. Plaintiff Indiana State Conference and the LaPorte County Branch of the National Association for the Advancement of Colored People ("NAACP") is the Indiana state and a local unit of the NAACP, a national nonprofit organization founded in 1909 with more than 2,200 units and two million members across the nation. The NAACP's mission is to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. The Indiana State Conference consists of approximately 5,000 NAACP members and has been a champion of environmental and climate justice in the State of Indiana since 2011 when it advocated against the building of a coal plant in Edwardsport, Indiana. The Indiana State Conference also helped elevate the soil crisis in East Chicago, Indiana in 2016–17; secured funding for the placement of solar panels on community centers in Evansville and Kokomo, Indiana; and secured energy efficient lighting in a community center in Hammond, Indiana. The LaPorte County Branch is comprised of approximately 250 NAACP members that predominately reside in LaPorte County, Indiana, where Northern Indiana Public Service Company's coal-fired Michigan City Generating Station is located.

16. Plaintiff Sierra Club, founded in 1892, is the nation's oldest grassroots environmental organization with its national headquarters in Oakland, California. Sierra Club is a nonprofit membership organization incorporated in California with more than 840,000 members in all fifty states and in the District of Columbia and Puerto Rico. Sierra Club's purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments. Sierra

Club's Beyond Coal campaign is a major effort to replace dirty coal with clean energy by mobilizing members in local communities to advocate for the retirement of old and outdated coal plants and to prevent new coal plants from being built. As part of this campaign, Sierra Club has prioritized efforts to ensure that coal-fired power plants safely dispose of their coal ash in compliance with RCRA and other environmental laws, including through communications, organizing, and litigation.

17. Plaintiff Clean Power Lake County ("CPLC") is a community-driven coalition based in Lake County, Illinois, where NRG Energy's coal-fired power plant Waukegan Generating Station is located. CPLC is committed to local action to secure environmental, economic, and racial justice. CPLC's mission is to ensure clean air, clean water, and healthy soil for every Lake County community member and to achieve the self-determination of those disproportionately impacted by environmental pollution. In 2019, CPLC successfully advocated for Illinois' Coal Ash Pollution Prevention Act, which required Illinois to put in place standards for coal ash impoundments that are at least as protective as the CCR Rule requirements, with additional protection against dust and water pollution. CPLC is currently advocating for legislation to ensure the removal of coal ash from two coal ash impoundments at the Waukegan plant.

18. Plaintiff Environmental Integrity Project ("EIP") is a nonpartisan, nonprofit organization founded in 2002 by former EPA enforcement attorneys to advocate for more effective enforcement of environmental laws. EIP's three objectives are: to provide objective analysis of how the failure to enforce or implement environmental laws increases pollution and affects the public's health; to hold federal and state agencies, as well as individual corporations, accountable for failing to enforce or comply with environmental laws; and to

help local communities in key states obtain the protection of environmental laws. EIP advocates for laws to protect public health and the environment from air and water pollution from coal-fired power plants and other large sources of pollution.

19. Plaintiffs and their members live, work, travel, and recreate near coal ash disposal facilities where inactive CCR landfills exist without safeguards to prevent the release of hazardous substances and other pollutants, because such safeguards are not required by EPA regulations. Plaintiffs' members use the rivers, lakes, landscapes, aquifers, and watersheds near facilities that store or dispose of coal ash in inactive CCR landfills for recreational and other purposes. Plaintiffs' members derive—or, but for the presence of coal ash in inactive CCR landfills, would derive—recreational, health, economic, and aesthetic benefits from their use of such places. The past, present, and future enjoyment of these benefits by Plaintiffs and their members has been, is being, and will continue to be harmed by Defendants' disregard of their statutory duties.

20. Members of Plaintiffs SOCM and Sierra Club live, work, travel, and recreate near the Tennessee Valley Authority's ("TVA") Bull Run Fossil Plant in Clinton, Tennessee, which has two unlined and leaking inactive landfills that are contaminating groundwater with arsenic and boron. For example, Todd Waterman, a member of SOCM and Sierra Club, lives in Clinton and suffers from respiratory impairment. Mr. Waterman regularly passes by, and exercises in, parks near the Bull Run plant. He is concerned about the effects of coal ash at the Bull Run plant on his health and his community. Sharon Todd—also a member of SOCM and Sierra Club—lives in Powell, Tennessee, two miles from the plant, can see the plant's smokestacks from her home, and regularly passes by the plant. She is concerned about the effects of the plant and its ash piles on her drinking water, her health, and the community.

21. Members of Plaintiffs HEC and NAACP live, work, travel, and recreate near the Michigan City Generating Station in Michigan City, Indiana, where two million tons of fill containing coal ash is currently exempted from regulation by EPA. The coal ash fill sits precariously behind corroding steel pilings on the shore of Lake Michigan. The toxic fill is leaking arsenic and other hazardous chemicals into the lake, as well as into an adjacent creek that is commonly used for fishing and boating. For example, Ashley Williams—a member of HEC, NAACP, and Sierra Club who lives just over a mile away from the Michigan City plant and visits or passes by the area nearly every day—is concerned about her increased exposure to coal ash pollution in the nearby air, lake and creek that diminishes her enjoyment of recreational activities and areas that she previously enjoyed. She is afraid to eat fish caught in Trail Creek and along the lakeshore and so refrains from doing so.

22. Plaintiff CPLC's volunteers live, work, travel, and recreate near the Waukegan Generating Station, where unregulated coal ash fill sits as deep as twenty-two feet below the surface and has been contaminating groundwater with boron and sulfate since at least 2010. For example, Karen Long MacLeod of CPLC—who lives approximately one mile from the Waukegan plant and visits and recreates at areas near the plant several times a year—has concerns about the effects of coal ash at the Waukegan plant on her health and her community that diminish her enjoyment of the activities and areas that she would like to continue to engage in or use.

23. Plaintiffs' members are exposed to hazardous constituents in coal ash from these facilities that contaminate soil, air, water, and aquatic life. The health effects from exposure to the contaminants in coal ash include cancer, birth defects, reproductive disorders, damage to the brain and nervous system, damage to the respiratory system, and other illnesses.

24. Plaintiffs' members have an interest in protecting their own health, the health of their children, and the health and economies of their communities and environment. Defendants' failure to review and revise existing regulations that fail to address the recognized risks and demonstrated harm posed by inactive CCR landfills increases the exposure of Plaintiffs' members and their environment to highly toxic pollutants that endanger their health and environment and leave their communities with blighted sites that constitute economic, health, and aesthetic burdens for Plaintiffs and their communities.

25. Plaintiffs' injuries are actual and concrete. Plaintiffs and their members have been and, unless the relief prayed for herein is granted, will continue to be adversely affected by the failure of Defendants to comply with RCRA. Defendants' failure to review and revise the regulation exempting inactive CCR landfills deprives Plaintiffs of the cleaner air and water that would result from a more stringent CCR Rule. Consequently, Defendants' failure prolongs and increases Plaintiffs' members exposure to coal ash pollution and the related and resulting health, recreational, aesthetic, economic and other injuries as described above.

26. An order mandating that Defendants review and revise the regulation exempting inactive CCR landfills by a date certain would redress Plaintiffs' injuries.

27. Defendant EPA is the federal agency charged with implementation of RCRA.

28. Defendant Michael S. Regan is the Administrator of EPA and in that role is charged with the duty to review and, as necessary, revise regulations according to the schedules set forth in RCRA.

## **STATUTORY BACKGROUND**

29. Congress passed RCRA in 1976, amending the Solid Waste Disposal Act (P.L. 89-272, 79 Stat. 992) to establish a comprehensive federal program to regulate the handling

and disposal of solid waste. *See* 42 U.S.C. § 6901. Congress recognized that—as a result of regulation under the Clean Air Act, the Clean Water Act, and other laws—industry was generating more toxic sludge and other pollution treatment residues that required proper disposal. *See id.* § 6901(b)(3). Further, Congress recognized that inadequate and environmentally unsound practices for the disposal of such solid wastes were responsible for air and water pollution that posed an unacceptable threat to human health and the environment. *See id*. RCRA was established to ensure that such solid wastes are handled responsibly and do not re-enter the environment.

30. The goal of RCRA is to promote the protection of health and the environment and to conserve valuable material and energy resources by ensuring the safe treatment, storage and disposal of solid waste. *See id.* § 6902. To achieve this goal, the Act requires that EPA, among other things: prohibit "open dumping" on the land and close existing open dumps; provide for the management and disposal of hazardous waste in a manner that protects human health and the environment; and promulgate guidelines for responsible solid waste collection and disposal practices. *Id.* § 6902(a)(3)–(5), (8), (b).

31. EPA regulates the disposal of most solid wastes that are not classified as hazardous under subtitle D of RCRA. In subtitle D, Congress directed EPA to promulgate regulations defining when a solid waste disposal facility is deemed to be a "sanitary landfill" as opposed to a prohibited "open dump." *Id.* § 6944(a). Section 4004(a) of RCRA provides a protectiveness standard that EPA's subtitle D regulatory criteria for sanitary landfills must meet. Namely, at a minimum, EPA's criteria can classify units as sanitary landfills and not open dumps "only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste . . . ." *Id*.

32. The regulations promulgated by EPA to ensure that a facility qualifies as a sanitary landfill take the form of "minimum criteria." *See* 42 U.S.C. § 6907(a)(3). If a waste unit fails to comply with the minimum criteria established by EPA for sanitary landfills, the unit is deemed to be an "open dump," which is prohibited under the statute. *Id*. §§ 6944, 6903(14). A facility operating an open dump (i.e., a facility out of compliance with EPA's criteria) must be "clos[ed] or upgrad[ed]" and is subject to citizen suits for "open dumping." *Id*. § 6945.

33. To ensure that regulations reflect emerging risks to human health and the environment as well as advances in technology and waste management practices, section 2002(b) of RCRA requires that each regulation promulgated under the Act "shall be reviewed and, where necessary, revised not less frequently than every three years." 42 U.S.C. § 6912(b).

34. Section 2002(b) of RCRA imposes a mandatory obligation on EPA to take action in accordance with the three-year statutory deadline. EPA cannot skirt its statutory responsibilities and must either: (1) complete its review and make a determination that revision is not necessary, or (2) complete its review, make a determination that revision is necessary, and issue revised regulations within the statutory deadline.

**REGULATORY BACKGROUND**

35. Even though coal ash is one of the largest industrial waste streams generated by U.S. industry, EPA promulgated the first rule attempting to regulate the disposal and handling of coal ash nearly forty years after RCRA's enactment, on April 17, 2015. 80 Fed. Reg. at 21,302. In its final rule, EPA acknowledged that coal ash contains many toxic and hazardous contaminants associated with serious health and environmental effects including arsenic,

cadmium, chromium, lead, mercury, selenium, and thallium. *Id.* at 21,311. EPA further noted that the risks to humans associated with exposure to coal ash contaminants include "cancer in the skin, liver, bladder and lungs," as well as other risks such as "neurological and psychiatric effects," "cardiovascular effects," "damage to blood vessels," and "anemia." *Id*. at 21,451. EPA also acknowledged that when improperly managed, coal ash (and the contaminants in it) leaks into groundwater, blows into the air as dust, and releases to surface waters and land through structural failures of landfills and impoundments. *Id*. at 21,449, 21,456-57.

36. For a limited universe of CCR landfills and surface impoundments, the CCR Rule established nationally applicable minimum criteria, including location restrictions; liner design criteria; structural integrity requirements; operating criteria; groundwater monitoring and corrective action; closure and post-closure requirements; and recordkeeping and notification requirements. 40 C.F.R. § 257.60–64, 70–74, 80–84, 90–98, 100–07. Failure to comply with these criteria results in the unit being deemed an “open dump” and, therefore, potentially subject to closure. *Id.* § 257.1(a); 80 Fed. Reg. at 21,468.

37. In particular, the CCR Rule established groundwater monitoring requirements for existing CCR landfills (those that accepted ash after October 19, 2015), existing surface impoundments, and, to a limited degree, inactive CCR surface impoundments. 40 C.F.R. § 257.90–95. The rule required the owners/operators of such CCR landfills and impoundments to monitor the groundwater near these disposal units for toxic contaminants and to make the groundwater monitoring data available to the public starting in March 2018. *Id*. §§ 257.90, 257.107.

38. While the CCR Rule applies to a number of CCR surface impoundments and landfills, it exempts all inactive CCR landfills. *Id.* § 257.50(d).

39. EPA expanded the CCR Rule in 2016, pursuant to a Petition for Review filed by environmental groups in 2015, to apply protective safeguards to “inactive surface impoundments.” *See Clean Water Action v. EPA*, No. 15-1228 (D.C. Cir July 16, 2015). These are defined as CCR impoundments at operating plants that did not accept CCR on or after October 14, 2015, and still contain both CCR and liquids on or after that date. 80 Fed. Reg. at 21,470.

40. Additionally, on August 21, 2018, the Court of Appeals for the District of Columbia ruled that EPA must expand the CCR Rule to address inactive CCR impoundments that are located at shuttered power plants, also known as “legacy ponds.” *USWAG v. EPA*, 901 F.3d 414, 422, 449 (D.C. Cir. 2018). The Court found EPA had exempted these legacy ponds from the rule even though they pose at least the same risks of adverse effects as all other inactive impoundments. *Id.* at 434. EPA has yet to revise the CCR Rule to regulate legacy ponds. Doing so will subject approximately 140 additional waste ponds to regulatory protections. Hazardous and Solid Waste Management System: Disposal of Coal Combustion Residuals From Electric Utilities; Legacy CCR Surface Impoundments, 85 Fed. Reg. 65,015, 65,018 (Oct. 14, 2020).

## FACTUAL BACKGROUND

### A. The Threat Posed by Inactive CCR Landfills.

41. As of 2012, our nation's coal-fired power plants burned more than half a billion tons of coal every year, producing more than 100 million tons of coal ash annually, in the form of fly ash, bottom ash, and boiler slag. 80 Fed. Reg.at 21,303. By weight, the amount of toxic chemicals in coal ash surpasses that created by pulp and paper mills, petroleum refiners, and textile mills combined. Because burning concentrates coal's impurities, coal ash contains

substantial quantities of carcinogens, neurotoxins, and poisons—including arsenic, cadmium, cobalt, lead, mercury, radium, selenium, and thallium. *Id.* at 21,311, 21,404.

42. When water contacts coal ash, toxic and hazardous contaminants readily leach from the ash into the water. For much of the last century, power companies dumped coal ash into unlined landfills and waste ponds, where the lack of a barrier between the coal ash and groundwater causes leaching and contamination of underground water supplies. *See id.* at 21,319. Groundwater polluted by coal ash makes its way into nearby surface waters. *Id*. at 21,325. In addition, the open dumping of coal ash has created hazardous air pollution, as wind easily disperses friable coal ash particles into the air. *Id*. at 21,386. Coal ash pollution is an environmental justice issue because coal ash dumpsites disproportionately threaten low-income communities and communities of color. *Id*. at 21,467.

43. Plaintiff EIP and Earthjustice, in collaboration with other environmental organizations, obtained and analyzed all the groundwater monitoring data that power companies posted on their websites in 2018.[1] The data cover 265 coal plants and offsite coal ash disposal areas, including more than 550 individual coal ash ponds and landfills monitored by more than 4,600 groundwater monitoring wells. This represents roughly three-quarters of the coal-fired power plants across the United States.[2] The environmental organizations analyzed these data because EPA failed to do so, and in fact, EPA has still not thoroughly and systematically reviewed and analyzed the data generated by its own rule.

---

[1] *See* EIP et al., *Coal's Poisonous Legacy: Groundwater Contaminated by Coal Ash Across the U.S.* (July 11, 2019), https://earthjustice.org/sites/default/files/files/national-coal-ash-report-7.11.19.pdf.

[2] The remainder of coal plants did not post groundwater data in 2018 either because they closed their ash dumps before the CCR Rule took effect in 2015 or because they were eligible for an extension or exemption.

44. After comparing groundwater monitoring data to health-based EPA standards and advisories, the EIP and Earthjustice analysis confirmed that groundwater beneath virtually all coal plants is contaminated[3]:

• Ninety-one percent of coal plants have unsafe levels of one or more coal ash constituents in groundwater, even after setting aside contamination that may be naturally occurring or coming from other sources.

• The groundwater at most coal plants (fifty-two percent) has unsafe levels of arsenic, which is known to cause multiple types of cancer. Arsenic is also a neurotoxin and, much like lead, can impair the brains of developing children.

• Most coal plants (sixty percent) have unsafe levels of lithium, a chemical associated with multiple health risks, including neurological damage.

• The majority of coal plants have unsafe levels of at least four toxic constituents of coal ash.

45. The contamination documented by the utility industry's groundwater monitoring data in 2018 is just the tip of the iceberg. Because the CCR Rule exempted inactive CCR landfills from all requirements of the rule, including groundwater monitoring, limited data were available for these units. The EIP and Earthjustice study reveals that this is a dangerous omission, as groundwater contamination exceeding federal health-based standards was found at seventy-six percent of the regulated CCR landfills.[4] Regulated landfills are newer and more likely to be lined than the older landfills EPA exempted from the CCR Rule. Thus, the exempted inactive CCR landfills are likely to be releasing even higher levels of toxic contaminants.

---

[3] EIP, *supra* note 1, at 15.
[4] *Id*. at 16.

46. EPA's exemption of inactive CCR landfills under the CCR Rule creates additional risks to health and the environment. The rule allows regulated CCR units that are contaminating groundwater to avoid monitoring, cleaning up, and preventing further contamination if the owner can claim in an alternative source demonstration that the source of contamination is an unregulated source, such as an inactive CCR landfill, even if the owner created that landfill and it is on the plant site. *See* 40 C.F.R. §§ 257.94(e)(2), 257.95(g)(3)(ii). At the Bull Run Fossil Plant, for example, TVA attributed the contamination at the site to "pre-existing groundwater conditions," but the details of the site clearly indicate contamination from historic coal ash disposal.[5] The harmful impact of the exemption is thus much broader than the specific sources it excludes; the rule's provisions work together to absolve owners of responsibility for essential protections such as monitoring and groundwater remediation without regard to the size of the site and the danger posed, thereby violating RCRA's protectiveness standard.

47. There are numerous sites where coal ash contamination is not monitored, assessed, and remediated because the CCR Rule fails to address, in any manner, landfills that ceased operation prior to 2015. Plaintiffs estimate that there are currently at least 292 inactive CCR landfills at 161 plants in thirty-eight states that are completely exempt from regulation under the CCR Rule. Regulations addressing these landfills would prevent exposure to deadly coal ash constituents, protect drinking water sources and aquatic ecosystems, and lead to much needed cleanups nationwide. Defendants' failure to review and revise the dangerous

[5]*See* TVA, *2020 Annual Groundwater Monitoring and Corrective Action Report*, Bull Run Fossil Plant Dry Fly Ash Stack Lateral Expansion CCR Unit at 39–40 (Jan. 29, 2021), https://www.tva.com/docs/default-source/ccr/brf/landfill---dry-fly-ash-stack-lateral-expansion/groundwater-monitoring/annual-groundwater-report/257-90(e)_annual-groundwater-monitoring-report_brf_dry-fly-ash-lateral-expansion-2020.pdf?sfvrsn=8070bc0a_2.

exemption for inactive CCR landfills has resulted in widespread, but undetected, contamination of groundwater and surface water, and prevented the cleanup of groundwater at sites where contamination exceeds federal health-based standards.

### B. Defendants' Failure to Review and Revise the Inactive CCR Landfills Exemption.

48. Defendants have neither completed a formal review nor revised the regulation exempting inactive CCR landfills since the CCR Rule's promulgation in 2015. Yet EPA formally determined as far back as 2000 that RCRA regulations are required for the protection of human health and the environment from the disposal of coal ash. *See* Notice of Regulatory Determination on Wastes from the Combustion of Fossil Fuels, 65 Fed. Reg. 32,214 (May 22, 2000).

49. Since the CCR Rule was promulgated, a significant amount of data generated by the CCR Rule has documented the severe and widespread effects on groundwater and surface water caused by coal ash disposed in surface impoundments and landfills. Defendants must review the information and data that have been released in the last seven years and revise the CCR Rule to be consistent with RCRA's protectiveness standard, 42 U.S.C. § 6944(a).

50. Had Defendants performed their mandatory duty to review the inactive CCR landfills exemption by 2018, within three years after the CCR Rule's promulgation, and revised the CCR Rule, basic safeguards would be in place for inactive CCR landfills that would keep coal ash toxins out of our drinking water, air, rivers, lakes, and streams, and require remediation at the scores of sites already known to be contaminating water at dangerous levels.

51. Defendants' review and revision of the inactive CCR landfills exemption is now more than four years overdue.

52. Defendants' failure to review and revise the inactive CCR landfills exemption since 2015 is a violation of section 2002(b) of RCRA. 42 U.S.C. § 6912(b).

53. Further, this constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of the RCRA citizen suit provision. 42 U.S.C. § 6972(a)(2).

## CLAIM FOR RELIEF

### VIOLATION OF 42 U.S.C. § 6912(b)
### (Failure to Review and Revise, as Necessary, 40 C.F.R. § 257.50(d))

54. Plaintiffs reallege and incorporate paragraphs 1 through 53.

55. Defendants violated section 2002(b) of RCRA by failing to review 40 C.F.R. § 257.50(d) and revise, as necessary, not less frequently than every three years. 42 U.S.C. § 6912(b).

56. Defendants' longstanding failure to complete a review of this regulation and revise the regulation accordingly pursuant to section 2002(b) of RCRA constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of 42 U.S.C. § 6972(a)(2).

## PRAYER FOR RELIEF

57. WHEREFORE, Plaintiffs request that this Court:

a) Declare that Defendants' failure to review and revise the inactive CCR landfills exemption not less frequently than every three years constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of 42 U.S.C. § 6972(a)(2);

b) Order Defendants to complete a review of the regulation exempting inactive CCR landfills from the CCR Rule;

c) Order Defendants to issue necessary revisions of the regulation exempting inactive CCR landfills from the CCR Rule in accordance with an expeditious deadline specified by this Court;

d) Retain jurisdiction of this action to ensure compliance with this Court's decree;

e) Award plaintiffs the costs of this action, including attorneys' fees; and

f) Grant such other relief as the Court deems just and proper.

DATED:	August 25, 2022

Respectfully submitted,

_s/ Charles McPhedran___
Charles McPhedran
Pa. Bar ID No. 60123
Earthjustice
1617 JFK Blvd., Ste. 1130
Philadelphia, PA 19103
cmcphedran@earthjustice.org
(215) 717-4521

Lisa Evans*
Earthjustice
21 Ocean Ave.
Marblehead, MA 01945
levans@earthjustice.org
(978) 548-8645

Gavin Kearney*
Earthjustice
311 South Wacker Dr., Ste. 1400
Chicago, IL 60606
gkearney@earthjustice.org

(773) 828-0816

Mychal Ozaeta*
Earthjustice
707 Wilshire Blvd., Ste. 4300
Los Angeles, CA 90017
mozaeta@earthjustice.org
(213) 766-1069

**Pro Hac Vice* application forthcoming

*Counsel for Plaintiffs Statewide Organizing for Community eMpowerment, Hoosier Environmental Council, Indiana State Conference and LaPorte County Branch of the National Association for Advancement of Colored People, Sierra Club, Clean Power Lake County, and Environmental Integrity Project*